| | | |
|---|---|---|
| DEBORAH PARIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 4:08-CV-71-PRC |
| | ) | |
| FAITH PROPERTIES, INC. and | ) | |
| FAITH CHRISTIAN SCHOOL, | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This matter is before the Court on (1) Defendants' Motion for Summary Judgment [DE 67], filed by Defendants Faith Christian School and Faith Properties, Inc. ("FCS") on July 16, 2010; (2) Plaintiff's Motion for Summary Judgment Against Faith Christian School, filed by Plaintiff Deborah Paris on August 2, 2010; (3) a Motion to Strike Portions of Affidavits [DE 81], filed by FCS on August 20, 2010; and (4) Defendants' Motion to Strike Plaintiff's Response in Opposition to Defendants' Motion to Strike [DE 86], filed by FCS on September 29, 2010. For the reasons set forth in this Order, the Court grants summary judgment in favor FCS on the breach of contract claim but finds that there are genuine issues of material fact for trial on the claim of Title VII retaliation.

## PROCEDURAL BACKGROUND

Plaintiff Deborah Paris filed her Complaint against Faith Christian School, Faith Properties, Inc., and Scott Grass on September 17, 2008. Defendants filed a Motion to Dismiss on November 12, 2008, which was granted by Senior District Court Judge Allen Sharp on January 30, 2009, giving Paris leave to file an amended complaint by March 2, 2009. On February 25, 2009, Paris filed an Amended Complaint, and on March 19, 2009, the FCS Defendants filed a Motion to Dismiss the Amended Complaint. On May 29, 2009, Plaintiff filed a Motion to Amend her Complaint, and on June 1, 2009, the FCS Defendants filed a Motion to Dismiss with Prejudice the First Amended

Complaint. On June 12, 2009, Judge Sharp granted the Motion to Amend Complaint and denied the Motions to Dismiss. Paris filed the Second Amended Complaint on June 16, 2009. All three Defendants filed a Motion to Dismiss the Second Amended Complaint on June 24, 2009. On December 8, 2009, District Court Judge Joseph S. Van Bokkelen granted in part and denied in part the Motion to Dismiss, granting the motion only as to Counts I, II, IV, and the state law claims in Count V of the Second Amended Complaint and dismissing Defendant Scott Grass; Counts III and the federal Title VII claims of Count V of the Second Amended Complaint remain pending. In Count III, Paris alleges breach of contract under Indiana law for failing to employ her for the standard school year when her employment was terminated in December. In Count V, Paris alleges that she was discharged in retaliation for having complained of acts of sexual harassment and discrimination in violation of Title VII, 42 U.S.C. § 200(e).

On January 28, 2010, the parties orally agreed on the record to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

FCS filed an Answer to the Second Amended Complaint on June 8, 2010, and filed the instant Motion for Summary Judgment and memorandum in support on July 16, 2010; Paris filed a response in opposition on August 12, 2010; and FCS filed a reply on August 20, 2010.

Paris filed the instant Motion for Summary Judgment Against Faith Christian School on August 2, 2010; FCS filed a response in opposition on August 16, 2010, and Paris filed a reply on August 30, 2010.

FCS filed the instant Motion to Strike on August 20, 2010. Paris filed her response in opposition on September 20, 2010; that same day, FCS filed a Motion to Strike the response brief. On September 21, 2010, Paris filed a response in opposition to the Motion to Strike her response brief. On September 27, 2010, FCS filed a reply in support of the August 20, 2010 Motion to Strike.

## MOTIONS TO STRIKE

At the time the Declarations of Paris and her husband, Peter Paris, were executed, the applicable standard for affidavits submitted in support of or in opposition to summary judgment was under Federal Rule of Civil Procedure 56(e), which provided: "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit." Fed. R. Civ. P. 56(e).[1] FCS filed a Motion to Strike paragraphs 3, 4, 12, and 13 of the Declaration of Deborah Paris (hereinafter "Paris' Declaration") (document 76-3) and paragraphs 2, 7, and 19 of the Declaration of Peter Paris (hereinafter "Dr. Paris' Declaration") (document 76-4), arguing that the declarations do not meet the requirements of Rule 56(e)(1).

As an initial matter, FCS also filed a Motion to Strike Paris' response in opposition to FCS' Motion to Strike Portions of Affidavits on the basis that Paris' response was untimely. FCS filed the Motion to Strike on August 20, 2010. Paris filed her response on September 20, 2010, thirty-one days after the motion was filed. Local Rule 7.1(a) provides that a response brief shall be filed fourteen days after service of a motion. In the interests of justice, because the Court prefers to rule

---

[1] On December 1, 2010, amendments to the Rules became effective, including to Rule 56. The applicable provision is now Rule 56(c)(4), which provides that an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

on the merits of evidentiary motions, and because, in any event, the Court will only consider on a motion for summary judgment evidence that is admissible, the Court denies the Motion to Strike Plaintiff's Response Brief. The Court addresses each evidentiary argument in turn.

## A. Paris' Declaration

In Paragraph 3 of her Declaration, Paris states, "Indiana law requires schools to teach 180 days for each school year, and an end date of a school year depends on the extent to which weather and other reasons have caused the school to be closed for one or more days during the school year." FCS argues that this is a statement of a legal conclusion and that there is no showing that Paris is competent to testify on the matter stated, or that it would be admissible without a proper foundation. Paris responds that, in her response brief in opposition to FCS's Motion for Summary Judgment, she cites the Indiana statute to which she is referring and that the statute is self-evidence. The first clause of Paragraph 3, that "Indiana law requires schools to teach 180 days for each school year" is a statement of law and is stricken. However, the remainder of the statement is within Paris' personal knowledge and experience as an educator. The motion is granted in part and denied in part as to this paragraph.

In Paragraph 4 of her Declaration, Paris states, "I signed the 'Salary Information Sheet' [Ex. 1] in this cause, and at all times understood that I had a contract for the 2007-2008 school year." FCS argues that there is no showing that Paris is competent to testify about whether the Salary Information Sheet constituted a contract and there is no foundation to establish that her testimony about the legal nature and effect of Exhibit 1 would be admissible. Paris responds that she is competent to state her understanding of the Salary Information Sheet. The Court finds that Paris is competent to state her understanding of the Salary Information Sheet and that this statement is not

a conclusion of law nor does it prevent the Court from considering, as a matter of law, whether there was a contract. The motion is denied as to this paragraph.

In Paragraph 12 of her Declaration, Paris states, "As a result of said termination, I only taught the first semester of the 2007-2008 school year, and was therefore paid only one-half of what I was scheduled to be paid on the 'Salary Information Sheet.'" FCS argues that it is for the Court to decide as a matter of law what the meaning and effect of the Salary Information Sheet is, including what, if anything, the employer was required to pay the employee. Paris argues that she is competent to testify as to how much compensation she received from FCS and that there is no dispute that FCS terminated Paris mid-year. The Court finds that Paris is competent to testify as to how much she was paid from FCS and that her statement does not preclude the Court from determining the legal meaning of the Salary Information Sheet. The motion is denied as to this paragraph.

In Paragraph 13 of her Declaration, Paris states, "I never adopted or made, directly or indirectly, any statement critical of Faith Christian School or Scott Grass at any time prior to my termination." FCS argues that this is a self-serving, conclusory statement and an opinion rather than a statement of fact. Although self-serving, this statement is based on Paris' own direct knowledge of her personal behavior and, therefore, is permissible on summary judgment. *See Dalton v. Battaglia*, 402 F.3d 729, 733 (7th Cir. 2005) (recognizing that the record may include a "self-serving" affidavit provided that it is based on personal knowledge and that the potential self-interest in giving the testimony goes to the weight and credibility of the testimony, not its admissibility).

## B. Dr. Paris' Declaration

In Paragraphs 2 and 7 of his Declaration, Dr. Paris states, "(See deposition of Paul Paris)." FCS argues that this reference to Paul Paris' deposition is not a statement made on personal knowledge, does not set out facts that would be admissible in evidence, and does not attach or serve a copy showing specifically what parts thereof were attempted to be incorporated. At the time Dr. Paris' declaration was executed on August 12, 2010, Federal Rule of Civil Procedure 56(e) required that a sworn or certified copy of a paper referred to in an affidavit be attached to or served with the affidavit. A copy of Paul Paris' deposition was also submitted in support of Paris' opposition brief. The fact that the Dr. Paris declaration does not identify which parts of Paul Paris' deposition support his declaration statements does not affect the admissibility of the general reference to Paul Paris' deposition, only the usefulness of the declaration to the Court. Accordingly, the motion is denied as to this paragraph of Dr. Paris' Declaration.

In Paragraph 19 of his Declaration, Dr. Paris states, "My wife never expressed an adoption of my statements regarding Grass, and she never stated anything offensive to either Grass or Lambeth. My recollection of these events is based upon the notes I made immediately after each incident and upon my memory." FCS argues that the first sentence is a self-serving conclusory statement and an opinion rather than a statement of fact. Paris argues that Dr. Paris is entitled to testify as a witness to the conversation as to whether or not Paris "expressed an adoption" of his statements. Dr. Paris' statement in this paragraph is based on his own direct observation of the events that he personally observed and, therefore, is permissible on summary judgment. *See Dalton*, 402 F.3d at 733.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; *see also* Fed. R. Civ. P. 56(c). The moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c). When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick*

*v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *See Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e)(2); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) provides that, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . [or] grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to

determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443.

## FACTUAL BACKGROUND

### A. Paris' Employment With FCS

FCS hired Paris in August 2006 as an elementary school teacher for the 2006-2007 school year. She was rehired in August 2007 by FCS for the 2007-2008 school year. At the time, Bob Leffew was co-administrator of the school but working for Scott Grass, who was transitioning into the position of administrator. Prior to rehiring Paris for the 2007-2008 school year, Leffew made a notation to a "Sandy" on a letter he received from Paris accepting the position for the 2007-2008 school year, which provided, in part: "The # of days [ ] she will need - so I can do a contract;" in his deposition, he testified that by the "contract" he meant a form used by FCS entitled "Faith Christian High School Staff Salary Information Sheet" ("Salary Information Sheet"). He wrote his name, "Bob," at the end of the notation to Sandy.

When Paris was hired by FCS in August 2007, a Salary Information Sheet, which was a standard form used by the high school and elementary school, was filled out by Leffew. On the Salary Information Sheet, Paris' name is indicated as "Debi Paris." To the right of the heading are the handwritten words "Lower Elem Music." Following her address, phone number, and years of experience, the line for "10 month employee" is checked with the original typed number 9 crossed out and the number 10 handwritten in (the other option, which was not checked, was "12 month employee"), and the date 4/30/07 is written in the right-hand margin on the same line. Also written in the right margin in the section titled "Salary" are the notations "8.25/hr x 11 hrs x 36 weeks =", "Start - M - 8/6", "End - S - 5/24", and the number "4,100" on the line across from "Total Cash

Salary." The line for "semi-monthly check amount (9 months)" is checked. The next section is titled "Fringe Benefits," and the only line on which a figure is written is for "Social Security" in the amount of "318." It is also indicated that Paris would not get "workman's compensation" but would get "paid vacation and sick days." At the bottom of that section, the number "318" is written on the line across from "Total Value of Fringe Benefits." Under that line the handwritten word "Totals" is followed by "4,478." In the right-hand margin below the number 4,100 and above the number 318 are written two bullet points: "K5-3rd Christmas Prog." and "K5-3rd Spring Prog." At the bottom of the page is typed: "I have read the policy manual of Faith Christian High School and agree to abide by the policies as long as I am employed by Faith Christian. I understand that this agreement is in effect only as long as I am a faithful employee of Faith Christian." Following this paragraph is Paris' signature. Finally, handwritten in the bottom margin of the paper is "* Mr Lambeth & you will work out your hrs." There is no place on the Salary Information Sheet for a signature of anyone from FCS.

Elementary Principal Jonathan Lambeth testified that the Salary Information Sheet informed Paris that it would be in effect only as long as she was a faithful employee of Faith Christian School. Lambeth further testified, in reference to a follow-up correspondence from Paris, "I mean, she refereed to her contractual duties when in fact there was not a contract. There was a mutual agreement that as long as she remained a faithful employee of Faith Christian School then she would be employed under certain terms." Pl. Mot., Exh. 4, p. 25. More specifically, in reference to the indication of a "10 month employee," Lambeth testified that "since this is a statement of as long as she was a faithful employee of Faith Christian, then she would be working there for what would be considered the school academic year and in the general areas of Kindergarten through 3rd grade

music, involving a couple of programs." Def. Mot., Exh. D, p. 33-34. Leffew referred to the Salary Information Sheet as a "contract," but explained that "it was not intended that in the legal sense of the term." Pl. Mot., Exh. C, p. 9. Leffew testified that Paris and FCS did not enter into a contract for employment but rather that the employment would continue as long as the employee was honoring the expectations of FCS and as long as they had enough students. He stated that the Salary Information Sheet was "[n]ot intended to be a contract. It's intended to let those parties know what's expected, how the salary of pay would be spread out." Def. Resp. Exh., p. 6. Paris understood the Salary Information Sheet to be a contract. Grass, the school administrator, testified that none of the FCS employees had or have contracts.

### B. Incidents of Alleged "Sexual Harassment and Discrimination"

Paris had four children attending Faith Christian School during the fall of 2007, one of which was a high-school aged son named Paul.

In approximately September 2006, one of two male students who frequently referred to Paris as "Fiona" in the presence of Paul touched the genital area of the other boy and asked him whether he needed "to get Fiona up here for some suction." Pl. Mot., Exh. 8, p. 2 (Answer to Interrogatory No. 2). Grass gave each boy 50 demerits, and one boy was removed from the soccer team. Grass testified that Paris had been dissatisfied with how those students had been disciplined.[2]

_____

[2] In her Declaration, offered in support of her response brief, Paris states: "After the September 8, *2007* meeting in which Scott Grass gave high school students S.C. [sic] B.Q. only 50 demerits for their sexual comments about me which they had made to my son, Paul, I told Grass that I disagreed with the light punishment given to those students." Pl. Resp., Exh. 3, ¶ 5 (emphasis added). However, Grass, when directly asked if the date of the incident in question was September 8, 2006, he agreed. Def. Mot, Exh. 3, p. 20. Similarly, in her deposition, Paris agrees that the incident with the two boys was in September 2006, with the incident occurring on September 4, 2006, and the meeting occurring on September 8, 2006. Also, in her brief in support of summary judgment, she states (without citation to the record), "From September 2006 through November 2007 Deborah Paris had made complaints to the school administration about sexually explicit comments made in the presence of her son, Paul Paris, by other students in reference to her." Pl. Mot, p. 4. Finally, in her answer to Interrogatory No. 2, she wrote that the incident occurred on September 4, 2006, and the meeting occurred on September 8, 2006.

Grass testified that, in the fall of 2007, there was a situation with some boys and Paris' son Paul in the lunch room during which one of the boys said, "This lunch sucks." Def. Mot., Exh. C, p. 8. As the boys talked back and forth, Paul said, "Your lunch sucks," and one boy responded to Paul, "Your mom sucks." *Id.* Grass met with the students and imposed discipline. The boy who made the comment "Your mom sucks" was given 25 demerits, he asked forgiveness of the boys in school, and he asked forgiveness of Paul. On November 12, 2007, Grass held a follow-up meeting with Paris at which the boy also asked Paris' forgiveness, which Paris accepted. However, Paris states in her Declaration that, after the student left: "I told Grass that he was condoning sexual harassment by this inaction and that I would not put up with it anymore and I'd be seeking a legal remedy." Pl. Resp., Exh. 3, ¶ 6. Grass was aware that Paris did not agree with Grass' discipline of the student.

On November 7, 2007, the Parises withdrew Paul from Faith Christian School. Grass understood that the reason for the withdrawal of Paul was the Parises' disagreement with the discipline given the student after the November 2007 incident.

On November 28, 2007, Paris brought to Grass' attention an email she had received that same day that was addressed to "Mrs. Deborah Paris" and signed by a "Debora Paris" but was from an undetermined source. Pl. Mot., Exh. 7, pp. 3, 4. The email had the subject line: "I'm an italian homonymous student" and provided: "I find your e-mail address on Internet just searching for an homonymous and just thinking it could be a pleasant idea! I'm an Italian girl, 31 years old, and I'm a Phd student in chemistry living in Napoli. What about make acquaintance? However, if you don't agree with me, well, sorry to disturb you! I'll never contact you anymore." *Id.* She forwarded the email to Grass the same day, asking whether he would investigate the email, whether the civil

authorities should be involved, or whether she should ignore the email. In an email response the next day, Grass offered to send the email to "Jonathan Smith" to see what he thought and indicated that he did not want to brush off the email despite expressing that he thought that it was a prank email that was not directed at her specifically. *Id*. at p. 2. In that email, Grass asked Paris to let him know if she wanted him to contact Jonathan to see if Jonathan could trace the email or to see what he thought. Grass testified that Paris informed him in person that she did not want him to do anything at that time but that, if anything else happened, she would let him know.

## C. The December 20, 2007 Meeting

On December 20, 2007, a meeting took place with Grass (the school administrator), Lambeth (the elementary principal), and Paris. The meeting was to be a semester review of Paris' employment. There had been a sheet for teachers to sign up for meetings, Paris signed up for a selected time, and the meeting occurred at the time selected by Paris. Grass describes the meeting as a routine meeting to review the first semester and to discuss with Paris their "professional relationship between employee and employer." Def. Mot., Exh. C, p. 6. Grass believed that their professional relationship had deteriorated over the prior month or so, and he was trying to take steps to improve the relationship. Grass asked Principal Lambeth to attend, which was routine.

Grass' intent was to discuss two main issues: the Paris family's church attendance and Grass and Paris' professional relationship. Grass had gotten the impression that Paris did not agree with the level of discipline FCS had given to the student who had said to Paris' son, "Your mom sucks." *Id.* at p. 8. Grass had the perception that there was not a good professional relationship because it was not pleasant when they would pass in the office or in the hallway and because Paris was cold to him. Grass also thought that another factor that may have led to the deterioration of their

professional relationship was Paris' concern about an email from an unknown sender that Paris speculated to have been generated by a person at FCS. Grass also wanted to confirm whether Paris had been faithfully attending a local church as required by the FCS Faculty Handbook because he was not aware if Paris was attending a church at that time.[3]

The December 20, 2007 meeting began with Grass asking Paris whether the discipline matters related to the incident in November 2007 affected Paris' position at FCS from her perspective. In response, Paris, who felt Grass was discussing her son Paul, expressed to Grass that she thought the meeting was supposed to be in regard to her job performance. She indicated that she did not see what past disagreements or problems over the discipline issue related to that November incident had to do with her job performance. Grass also inquired about Paris' church attendance. At the meeting, Paris maintained that she was conducting her classes and programs properly and with a spirit of excellence, an assertion with which neither Grass nor Lambeth disagreed. Grass stated that he felt awkward and uncomfortable with Paris and that he wanted to do everything possible to restore his relationship with Paris' husband, Dr. Paris. Paris responded that, if the meeting was going to be a family meeting, her husband would need to be present. Grass asked her to call her husband, which she did, and he arrived about ten minutes later.

After Dr. Paris arrived, Grass indicated that he wanted to discuss his relationship with Dr. Paris, and Dr. Paris responded that there was no relationship. In response to questions from Grass

---

[3] The Faculty Handbook, to which Paris had agreed, provided: "All teachers should be faithful to church services. We encourage teachers to set an example of serving others through various outreach opportunities. Of course, you should be balanced and not over commit." Def. Mot., Exh. B, Exh. 3, p. 5. Paris understood that the purpose of the Faculty Handbook was to inform teachers of what was expected of them. When the 2007-2008 school year started, Paris and her family attended Faith Baptist Church as well as Family Baptist Church. However, following a November 4, 2007 meeting with Grass, Paris and her family ceased attending Faith Baptist Church, which meant that if anyone from the administration of FCS had been looking for Paris at Faith Baptist Church after November 4, 2007, they would not have seen her.

and Lambeth, Dr. Paris stated that he disagreed with the way in which Grass had handled issues with regard to their son Paul and with Paris. At one point, Principal Lambeth asked Dr. Paris what he thought about Grass, and Dr. Paris responded that "he is a pathetic excuse for a man." Def. Mot., Exh. B, p. 44 (Paris Dep.). Lambeth asked Dr. Paris under what conditions Dr. Paris would feel comfortable with Paris working at FCS the following year, and Dr. Paris responded, "If there was a new administrator." *Id*. at p. 47. Paris took no part in this exchange and was mostly silent. She did say that she was uncomfortable having to see the students who had made sexually explicit comments about her during school hours.

In his deposition, Grass testified that Dr. Paris had called him an "incompetent leader" and questioned Grass' relationship with Christ. Grass testified that he then asked Paris if she believed he was an incompetent leader and if she felt the same way and that she indicated yes, testifying that Paris "adopted Mr. Paris' comments and – about myself as the school administrator and she adopted them as her own." Def. Mot., Exh. C., p. 25.

Lambeth testified that he asked Paris if she agreed with her husband's characterization of Grass and he understood her answer to be that she did agree with her husband. Prior to his deposition, Lambeth had written, "I asked her if she agreed with her husband's characterization of Mr. Grass. And she said but when comparing the authority of the school with the authority of her husband, she would need to follow the authority of her husband. Mr. Grass agreed." Pl. Mot., Exh. 7, p. 10-11. Lambeth testified that the only inference that could be taken from her statement was that she adopted her husband's statements, although he acknowledged that someone else might have a different interpretation.

Paris disagrees with this characterization of her participation in the conversation following her husband's comments. Paris' interrogatory response provides that Dr. Paris stated that he would only feel comfortable with Paris working at FCS if there were a new administrator, Grass asked Paris if she felt the same way to which she responded, "I have a contract and I have every intention of fulfilling that contract." Pl. Mot., Exh. 8, p. 12. Also, Paris testified and both Paris and Dr. Paris state in their sworn Declarations that Paris' statement that she would follow her husband's authority was in reference to Dr. Paris' refusal to answer questions from Grass about whether Paris and Dr. Paris were having marital problems.

Following the exchange with Paris, Grass stated that he had no choice but to terminate Paris' employment. As the FCS administrator, Grass had the authority to hire and fire teachers. Grass then asked Lambeth whether he saw things any differently, and Lambeth responded, "no." Def. Mot., Exh. B., p. 57 (Paris Dep.).

Following the meeting, Grass drafted a memorandum dated December 20, 2007, summarizing the meeting. He indicated therein that he brought up the issue of Paris' family, in part, because he wanted to discuss their personal and professional relationship in relation to the fact that the Parises had withdrawn their son, Paul, from the school in the beginning of November. He further wrote that he "realized that the Paris' were not supportive of the administration's decision regarding" the November 2007 incident. He recounted some of the conversation with Dr. Paris, *see* Analysis Part A.2 below), including asking Paris if she felt the same way and she responded that "she needed to obey her husband." Pl. Mot., Exh. 7, p. 9. As for her termination, Grass wrote, "I told Mrs. Paris that I understood and I believed it to be best for us to relieve her of her duties based

on the fact that she/her husband were not supportive of the school administration." Pl. Mot., Exh. 7, p. 9. Lambeth also wrote a memorandum immediately following the meeting.

At his deposition, Grass testified that he felt that, during the course of the meeting, Paris became an unfaithful employee of the school by adopting as her own her husband's comments attacking and disrespecting Grass as the school administrator, including statements that Grass was an incompetent leader, that Grass was not a Christian, and that Grass had failed as a leader. Both Grass and Lambeth testified that Paris' employment was terminated because she adopted those statements and, thus, became an unfaithful employee. Lambeth testified that, in any reasonable work situation, actions that come across as having a poor attitude and insubordination cannot continue in a positive work environment. Lambeth testified that he had not expected the meeting to end with Paris' termination.

When Dr. Steve Viars, Pastor of Faith Baptist Church, founding pastor of FCS, and a member of the board of FCS, was told of Paris' participation in the December 20, 2007 meeting, which he described as insubordination, Dr. Viars felt that there was no question that Paris should have been dismissed. Dr. Viars testified that FCS does not believe in insubordination and that the statements of Dr. Paris that Paris agreed to in the December 20, 2007 meeting will not be tolerated by anybody who wants to work at FCS.

In the Faculty Handbook, the FCS Mission Statement is specified as, "Faith Christian School is dedicated to assisting Christian parents in fulfilling their God-given responsibility of training their children by providing a godly atmosphere that equips students to grow both academically and spiritually in order to serve God effectively in their home, church, and community." Def. Mot., Exh. B, Exh. 3, p. 1. Under the heading "Evaluation and Accountability" in the "Philosophy" section,

the Handbook provides: "Our first priority is to have a spiritual atmosphere." *Id*. at p. 2. The Handbook further provides that "[t]he Administrator and Principals influence the spirituality of the school through faculty prayer and sharing Scriptural principles with the faculty as well as being involved in a Biblical counseling of students." *Id*.

That same day, December 20, 2007, Grass wrote the Parises a letter that provided only: "Per our discussion today Faith Christian School will relieve you and your family of all financial and contractual obligations for the second semester." On December 21, 2007, Paris wrote Grass a letter asserting that the December 20 letter did not constitute a termination of her employment and that she considered herself still under contract unless she received clear, written notice that her employment was terminated.

On December 22, 2007, FCS sent Paris a letter of clarification, signed by Grass, confirming that Paris' employment with FCS had been terminated and providing: "You listed your achievements and accomplishments, and indeed you are talented and have been productive in many ways. For that we thank you. But the position of Faith Christian School is that in order for a Christian school administration and faculty to fulfill their collective mission, there must be proper order, an excellent attitude, and freedom from antagonism directed toward the leadership. These factors are ultimately as important as the technical skills of a teacher." Def. Mot., Exh. B, Exh. 2.

Paris states in her Declaration that she never adopted any statement made by her husband that was critical of Grass: "I never adopted or made, directly or indirectly, any statement critical of Faith Christian School or Scott Grass at any time prior to my termination." Pl. Mot., Exh. 3, ¶ 13.

Paris testified that, prior to the December 20, 2007 meeting, no one with the administration of FCS had indicated that there was any issue that might lead to her termination. Prior to the

18

December 20, 2007 meeting with Paris, no one had suggested to Grass that Paris should be fired. Grass testified that, prior to the meeting, Paris performed well as a teacher, Paris was courteous, and Grass was not dissatisfied with her as a teacher. Leffew stated that he had never experienced Paris to be discourteous or rude to anybody, that she had not received any complaints from parents to his knowledge, and that he thought she was a good and competent teacher, was liked by her students, worked hard, and conducted herself well.

## ANALYSIS

Paris alleges that FCS entered into a ten-month employment contract with her on August 6, 2007, and that FCS breached the contracted by terminating her employment prior to the second semester of the 2007-2008 school year. Paris also alleges that her termination by FCS was in retaliation for asserting protected rights in violation of 42 U.S.C. § 2000(e). The parties have filed cross motions for summary judgment on these two remaining counts (Counts III and V) of Paris' Second Amended Complaint.

### A. Title VII Retaliatory Discharge

In the December 8, 2009 Opinion ruling on Defendants' Motion to Dismiss, the Court held that Paris had stated a claim for retaliatory discharge under Title VII but dismissed any claims for retaliation under Indiana state law. *See* 12/8/09 Opinion, p. 10, n. 1. The Court based the decision on the allegations in ¶ 77 of Paris' Second Amended Complaint that Defendants terminated her employment "as a result of her complaining as to acts of sexual harassment and discrimination." *Id*. at p. 10.

Under Title VII, it is unlawful for an employer to "discriminate against" an employee "because [she] has opposed any practice made an unlawful employment practice" by Title VII or

"because [she] has made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). "A plaintiff may prove retaliation by using either the direct method or the indirect, burden-shifting method." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006) (quotations and citations omitted). Paris proceeds exclusively under the direct method, which requires a plaintiff to show that (1) she engaged in statutorily protected activity, (2) she suffered an adverse action by the employer, and (3) there is a causal connection between the two. *Leitgen v. Franciscan Skemp Healthcare, Inc.*, — F.3d — , —, 2011 WL 108694, at * 5 (7th Cir. 2011) (citing *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010); *Casna v. City of Loves Park*, 574 F.3d 420, 426 (7th Cir. 2009)).[4] The parties do not dispute that Paris suffered an adverse employment action when her employment was terminated. However, the first and third elements are disputed, each of which the Court considers in turn.

*1. Protected Activity*

Although Paris alleges generally in her Second Amended Complaint that her employment was terminated "as a result of her complaining as to acts of sexual harassment and discrimination," in her briefing on the cross motions for summary judgment, Paris now more specifically describes her protected activity as having expressed dissatisfaction with the discipline Grass gave the students who made the allegedly sexually harassing comments and the email of a sexually explicit nature: "Deborah Paris was engaging in a statutorily protected activity by expressing dissatisfaction with the way in which Scott Grass was handling the discipline of students who had made sexually explicit comments about her to her son, Paul, and with the e-mail she had received that was also of a

---

[4] FCS seeks summary judgment on the retaliation claim under both the direct and indirect methods but Paris responds only with argument in support of the direct method; similarly, in her Motion for Summary Judgment, Paris seeks judgment in her favor solely under the direct method.

sexually explicit nature.," Pl. Mot., p. 15-16, and "That Plaintiff Deborah Paris engaged in protected activity or expression is established by the undisputed facts that Deborah Paris complained to Scott Grass about Grass's lax treatment of the students who had made the sexually explicit comments about her to her son, Paul, about the lewd e-mail, and about her specific charge to Grass that by his lax treatment of the students, he was condoning sexual harassment and that she would seek legal remedy," Pl. Reply, p. 5.

For Paris to show that she engaged in protected conduct in support of her retaliation claim, she must demonstrate that "she reasonably believed in good faith that the practice she opposed violated Title VII," even if the opposed action does not in fact violate Title VII. *Fine v. Ryan Intern. Airlines*, 305 F.3d 746, 752 (7th Cir. 2002) (quoting *Alexander v. Gerhardt Enters., Inc.*, 40 F.3d 187, 195 (7th Cir. 1994)); *see also Leitgen*, — F.3d at —, 2011 WL 108694, at * 5 (citing *Tate v. Exec. Mgmt. Servs., Inc.*, 546 F.3d 528, 532 (7th Cir. 2008); *Fine*, 305 F.3d at 752); *Durkin v. City of Chi.*, 341 F.3d 606, 615 (7th Cir. 2003) ("[A]n employee may engage in protected activity under § 2000e-3 even if the conduct at issue does not violate Title VII")); *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1457 (7th Cir. 1994) (same). This burden is not onerous. *Leitgen*, — F.3d at —, 2011 WL 108694, at * 5 (citing *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 892 (7th Cir. 2004)). Rather, a plaintiff must show that the belief that she was complaining about unlawful discrimination was not "completely groundless." *Id.* (citing *Fine*, 305 F.3d at 752 (quoting *McDonnell v. Cisneros*, 84 F.3d 256, 259 (7th Cir.1996))). Sexual harassment and a sexually hostile work environment are actionable under Title VII. *See* 42 U.S.C. § 2000e-2(a); 29 C.F.R. § 1604.11.

First the Court considers the "sexually harassing" email that Paris received on November 28, 2007. That same evening at 10:42 p.m., Paris sent Grass an email that included a copy of the email

she had received, expressed three interpretations as to the meaning of the email, described the email as "sexually harassing correspondence," and asked Grass for his advice on how to proceed, concluding her email with: "Please let me know if you will get to the bottom of this, or do civil authorities need to be contacted or should I simply ignore it. I trust that the administration will know how best to deal with this in a Christ honoring way." Pl. Mot., Exh. 7, p. 2. Grass responded by email the next morning at 5:51 a.m., offering to follow up on the email by contacting "Jonathan Smith," indicating that he did not want to "brush it off" but that he thought it was a prank not specifically directed at her, indicating that he, too, received similar "junk mail," and asking if she would like him to contact Jonathan to see if he could trace the email or see what he thinks. He concluded the email: "Let me know – you can stop by and see me." *Id.*

There is no evidence of record that Paris sent any further email response asking him to go ahead with an investigation, and Grass testified at his deposition that he spoke with Paris in person and that she told him not to follow up but that she would contact him if anything further happened. Moreover, Paris' earlier comment to Grass that he was "condoning sexual harassment by his inaction" cannot be in reference to the November 28, 2007 email, as the comment was made immediately following the November 12, 2007 meeting with the offending student. Nevertheless, Grass testified in his deposition that one of the two issues he wanted to discuss with Paris at the December 20, 2007 meeting was their professional relationship, which he felt had deteriorated over the prior month, in part because of Paris' concern about the email that Paris speculated to have been generated by a person at FCS. Although there is no evidence that the email was discussed at the December 20, 2007 meeting, Paris had brought it to Grass' attention as sexually harassing material prior to the meeting.

The Court turns to Paris' disagreement with the discipline given by Grass to the students who had made allegedly sexually explicit comments. FCS argues that Paris' dissatisfaction with the way Grass handled the discipline cannot constitute protected activity because, as a matter of law, there can be no basis for employer liability for a sexually hostile work environment when the school disciplined the students involved, citing *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 731 (7th Cir. 2009) ("Under Title VII, an employer can avoid liability for hostile environment sexual harassment if it promptly investigates a complaint when made and then, if warranted, 'takes steps reasonably likely to stop the harassment.'") (quoting *Saxton v. AT&T*, 10 F.3d 526, 536 (7th Cir. 1993)).[5] Nevertheless, as noted above, even if Paris' "subjective disagreement with the discipline does not establish unreasonableness or deliberate indifference" to hold the employer liable for *hostile work environment*, *see Lucero*, 566 F.3d at 732, the relevant inquiry for the *retaliation claim*

---

[5] On page 12 of the Reply Brief, FCS also argues that "[t]he other two complaints are much, much less offensive than those in the line of Seventh Circuit cases upholding summary judgments against complaining plaintiffs," referencing Paris' complaints about the email and the November 2007 student behavior. However, the cited cases all address whether the given complained-of conduct constituted a *hostile work environment*, which is not an issue before this Court as Paris' hostile work environment claim has already been dismissed. These cases do *not* discuss whether a plaintiff had engaged in "protected activity" by complaining of the conduct even though the conduct was ultimately found not to violate Title VII; rather, the first element of a retaliation claim-"protected activity" appears to be assumed in some of these cases that go on to address the third element of the retaliation claim–"causal connection"–even though the hostile work environment claim had failed. *See* Def. Reply, p. 12 (citing *Yuknis v. First Student, Inc.*, 481 F.3d 552, 553-554 (7th Cir. 2007) (complained-of conduct did create a hostile work environment actionable under Title VII); *Rogers v. City of Chi.*, 320 F.3d 748, 750, 752-753 (7th Cir. 2002) (holding that the plaintiff could not prove that she worked in an objectively offensive environment for her sexual harassment claim); *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 463 (7th Cir. 2002) (complained-of conduct did create a hostile work environment actionable under Title VII); *Baskerville v. Culligan Int'l*, 50 F.3d 428, 430 (7th Cir. 1995) (finding that the complained of conduct did not "add up to sexual harassment"); *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir. 1993) (complained-of conduct did create a hostile work environment actionable under Title VII); *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 328 (5th Cir. 2004) (same); *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 871-75 (5th Cir. 1999) (same); *citing also Moser v. Indiana Dep't of Corrs.*, 406 F.3d 895, 902-03 (7th Cir. 2005) (same); *Adusumilli v. City of Chi.*, 164 F.3d 353, 361-62 (7th Cir. 1998) (same); *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1145 (7th Cir. 1997) (same); and *Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996) (same)).

is whether "she reasonably believed in good faith that the practice she opposed violated Title VII." *Fine*, 305 F.3d at 752.[6]

FCS does not contest, and the facts viewed in the light most favorable to Paris suggest, that Paris honestly believed that Grass was unlawfully condoning sexual harassment when he failed to mete out more severe punishment to the student in early November 2007 or the students in September 2006. Grass testified that Paris was dissatisfied with the discipline given the two students in 2006. Immediately following the November 12, 2007 meeting at which the student apologized to Paris, Paris told Grass that he "was condoning sexual harassment by [his] inaction and that I would not put up with it anymore and I'd be seeking a legal remedy." Pl. Resp., Exh. 3, ¶ 6. Grass testified that he was aware that Paris did not agree with the discipline given. A reasonable jury could find that Paris' belief that she was opposing discrimination was objectively reasonable.

## 2. Causal Connection

Under the direct method, a plaintiff must provide either direct evidence or circumstantial evidence that the employer acted based on a prohibited animus. Regardless of the type of evidence offered, Paris may avoid summary judgment only by presenting sufficient evidence to create a triable issue of whether her termination had a discriminatory motivation. *Montgomery v. Am.*

---

[6] In *Fine*, the Seventh Circuit Court of Appeals reasoned:

> Yet the heart of Ryan's attack lies in the fact that Fine's discrimination claim failed to survive summary judgment. How, it argues, could Fine reasonably have believed she was complaining about discrimination when the district court found that she was not discriminated against as a matter of law?
>
> Asking the question in this fashion reveals the crux of Ryan's mistake. It is improper to retaliate against anyone for claiming a violation of Title VII unless that claim is "completely groundless." *McDonnell*, 84 F.3d at 259. But a groundless claim is one resting on facts that no reasonable person possibly could have construed as a case of discrimination. Many claims might appear legitimate on the surface, but after discovery and a harder look at the full picture they turn out ultimately to lack merit. Under Title VII, a person may not be terminated for making such a grounded, yet unsuccessful, complaint.

305 F.3d at 752.

*Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010). Paris offers no direct evidence that she was fired for complaining about what she perceived to be sexual harassment and discrimination. However, a plaintiff may demonstrate a causal link by "constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Phelan v. Cook County*, 463 F.3d 773, 779 (7th Cir. 2006) (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). The Seventh Circuit recognizes four types of circumstantial evidence: (1) suspicious timing; (2) ambiguous oral or written statements; (3) behavior toward or comments directed at other employees in the protected group; and (4) other bits and pieces from which an inference of discriminatory intent might be drawn. *See Boumehdi v. Plastag Holdings, L.L.C.*, 489 F.3d 781, 792 (7th Cir. 2007) (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)).

To establish a causal link, Paris first notes that in September 2006, Paris complained to Grass that punishment of two high school students for the sexually explicit comments about her that they made to her son was not sufficient. Also, in the month prior to being terminated, Paris complained to Grass about another incident where a different student commented to Paris' son that "Your mom sucks" and the student was punished. However, immediately after the meeting with the student, Paris informed Grass that "he was condoning sexual harassment by this inaction and that [she] would not put up with it anymore and I'd be seeking a legal remedy." Pl. Resp., Ex. 3, ¶ 6. Grass testified that he knew Paris was dissatisfied with the discipline given following both incidents. Approximately two weeks after that, Paris brought the alleged "sexually harassing" email to Grass' attention. Grass testified that he thought the deterioration in their professional relationship was caused, in part, by all of these incidents.

Paris relies in part on the temporal proximity between her statements of dissatisfaction with the punishment given to the students, her comment that she would pursue legal action, bringing the email to Grass' attention, and her termination. The Seventh Circuit has repeatedly held that suspicious "timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim." *Leitgen*, — F.3d at —, 2011 WL 108694, at * 6 (citing *Leonard v. E. Ill. Univ.*, 606 F.3d 428, 432-33 (7th Cir. 2010); *Turner v. Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010)).

Paris first contested the punishment given to the two students in September 2006, approximately 15 months prior to her termination. "When an employee's protected conduct is separated by a significant period of time from the adverse employment action, the proximity of the incidents does not support a causal connection between them." *Id.* at —, * 7 (citing *Leonard*, 606 F.3d at 432 (finding adverse employment action six months after protected conduct insufficient to establish retaliation claim); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (seven weeks between events)). If Paris' 2006 complaint were the only event offered, the temporal proximity to her December 2007 termination would be too attenuated to establish retaliation. However, she again disagreed with punishment given in early November 2007, approximately six weeks prior to the end-of-semester meeting at which she was terminated. Her dissatisfaction with the September 2006 discipline was again raised in the context of why the November 2007 discipline was insufficient, when Dr. Paris spoke with Grass on November 4, 2007 and reminded Grass "of his earlier statement that he would deal with future incidents more harshly and severely." Pl. Resp., Exh. 4, ¶ 7. Also, Paris forwarded the "sexually harassing" email to Grass on November 28, 2007, less than one month prior to her termination.

Paris notes that the opening questions of the meeting referenced her son Paul and his withdrawal, which she felt were directly connected to the issue of the discipline given the offending students. In addition, Paris notes that her husband's criticisms of Grass at the December 20, 2007 meeting, once he had arrived, were directed at Grass' handling of the student discipline. Grass testified that he understood that the Parises withdrew Paul from FCS in November 2007 because of what they perceived to be lenient treatment of the student involved in the November 2007 lunchroom incident. Grass also testified that he knew that Paris did not agree with the discipline given in response to the incident. Finally, Grass testified that he called the December 2007 meeting to address what he viewed to be a deterioration in his relationship with Paris that was based, in part, on these events. The Court finds that the timing of Paris' complaints, in light of Grass' testimony as well as the other circumstances discussed below, is sufficiently close in time to Paris' termination to support a causal connection.

In addition to timing, Paris argues that Grass has asserted inconsistent and conflicting reasons for Paris' termination, comparing the language of Grass' memorialization executed immediately following the December 20, 2007 meeting with the reason given in his deposition testimony two years later. Paris argues that the December 20, 2007 memorandum is the account by him closest in time to the event and, thus, presumably the most reliable and that his memorandum represents that he terminated her employment because she was unsupportive of the administration's decisions regarding the student discipline.

In paragraph 2 of the memorandum, Grass wrote: "In addition to discussing Mrs. Paris' first semester, I wanted to discuss our relationship (both personal/professional) due to the fact that they had pulled their son, Paul, out of school back in the beginning of November." Pl. Resp., Exh. 2, ¶

2.  In the next paragraph, he wrote, "I realized that the Paris' were *not supportive of the administration's decision* regarding an incident that involved Paul and [S.D.]." *Id.* at ¶ 3 (emphasis added).  Grass then describes the discipline given to the student in November 2007, identifies who was present at the December 20 meeting, notes his expression of thanks to Paris for her "hard work and the programs that she was directing," *id.* at ¶ 6, recounts his inquiry as to the two topics he wanted to discuss–the Paris family church attendance and his and Paris' professional/personal relationship, and notes Paris' request that her husband be present.  He wrote in the memorandum, "It was obvious to me that prior to meeting that our relationship was strained.  I believe that the cause of this strained relationship *was due to the administration's decision to the above incident*." *Id.* at ¶ 9 (emphasis added).  Grass recounts that Paris again asked that her husband be present, that Grass agreed, and that Dr. Paris arrived.  He then writes,

> 13.  I started the conference saying that it was my goal to help improve our relationship.
> 14.  Mr. Paris indicated that there was no relationship.
> 15.  He said that I was an incompetent leader and that he questioned my relationship with Christ.
> 16.  I asked Mr. Paris if it would be better if Mrs. Paris did not work at FCS.  He indicated that she was under contract and that she would fulfill her contract.  I asked him again if he wanted her to work at FCS – he said no.
> 17.  I asked Mrs. Paris if she felt the same way.  She indicated that she needed to obey her husband.
> 18.  I told Mrs. Paris that I understood and I believed it to be best for us to relieve her of her duties based on the fact that she/her husband were not supportive of the school administration.

*Id.*

As noted in the prior section, the meeting opened with Grass asking Paris about her son Paul, and once Dr. Paris arrived at the meeting at Paris' request and Grass' agreement, Grass and Dr. Paris discussed both the September 2006 student incident and the November 2007 student incident, Dr.

Paris reminded Grass that he had promised following the 2006 incident that if something like that happened again, it would be dealt with more harshly and severely, Dr. Paris asserted that Grass had not kept his word, and Grass responded that the punishment had kept the offending students in 2006 from reoffending. In the context of the evidence of record of the discussion that occurred at the December 20, 2007 meeting, the memorandum Grass authored immediately thereafter can be reasonably interpreted to indicate that he terminated Paris' employment because she expressed her disagreement with the punishment given the students.

In contrast, FCS argues, based on Grass' deposition testimony, that Grass terminated Paris' employment because she adopted the derogatory statements her husband had made about Grass. First, FCS attempts to use the memorandum in support of this position by referring to paragraph 17 in which Grass writes that Paris indicated she needed to "obey her husband." However, the manner in which the conversation is retold in the memorandum makes it appear that, when Grass asked Paris "if she felt the *same way*" in paragraph 17, his question and her answer were in reference to the previous paragraph of the memorandum, regarding whether her husband still wanted her to work at FCS. Paris argues that her statement cannot reasonably be interpreted to mean that she was affirming her husband's earlier critical statements recounted in paragraphs 14 and 15. In fact, she argues that her comment can only be interpreted as an "assertion of her right to not argue with her spouse for the sake of saving her job." Pl. Resp., p. 10. In addition, both Paris and Dr. Paris, in their sworn Declarations submitted in response to summary judgment, and Paris in her deposition, explain that Paris' comment that she would have to obey her husband was in response to an inquiry by Grass to Paris about whether the Parises were having problems in their marriage, a question which Dr. Paris had already answered by saying it was "none of your business." Pl. Resp., Exh. 4, ¶ 15-16.

Both Paris and Dr. Paris deny under oath that Paris ever directly, or indirectly, adopted her husband's statements critical of Grass.

Paris notes that there is no statement in the memorandum that Paris "adopted" her husband's critical statements about Grass. Rather, Grass makes this assertion for the first time in his deposition, two years later. At his deposition, Grass testified that, after Dr. Paris called him an "incompetent leader" and questioned Grass' relationship with Christ, Grass asked Paris if she believed he was an incompetent leader and if she felt the same way and that she indicated yes. Grass testified that Paris "adopted Mr. Paris' comments and–about myself as the school administrator and she adopted them as her own." Def. Br., Exh. C., p. 25. Lambeth agreed that, from his perspective, there was no other inference that could be made other than that Paris agreed and that Paris had adopted as her own Dr. Paris' statements disrespecting Grass. In his memorandum written immediately after the December 20, 2007 meeting, Lambeth wrote, "I asked her if she agreed with her husband's characterization of Mr. Grass, and she said that when comparing the authority of the school with the authority of her husband, she would need to follow the authority of her husband." Pl. Mot., Exh. 7, p. 10-11. Although Lambeth was not the decisionmaker, his testimony is relevant to a trier of fact about the veracity of the impression or meaning that Grass had of Paris' statements at the meeting. On the instant cross motions for summary judgment, his testimony does nothing more than reinforce that there is a genuine issue of material fact for the jury.

Paris argues extensively that she did not adopt her husband's statements critical of Grass at the December 20, 2007 meeting. FCS correctly responds that the focus of the inquiry is *not* whether Grass accurately interpreted Paris' statements as adopting all of her husband's derogatory comments but *rather* whether Grass honestly believed that Paris had adopted her husband's derogatory

statements and, thus, was no longer a faithful employee of FCS.  *See Argyropoulos v. City of Alton*, 539 F.3d 727, 735 (7th Cir. 2008); *McGowan v. Deere & Co.*, 581 F.3d 575, 581 (7th Cir. 2009); *see also Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 480 (7th Cir. 2010); *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592 (7th Cir. 2003) (explaining that the "pretext" category of circumstantial evidence under the direct method is substantially the same as the evidence required under the indirect method).  If Grass' deposition testimony that he believed Paris had adopted her husband's derogatory statements were the only evidence of the basis for his decision to terminate Paris' employment, then the inquiry would end here.  However, the testimony appears to be in conflict with Grass' memorandum statements implying that he terminated Paris' employment because he felt she was unsupportive of the administration due to her disagreement with the level of discipline given to the student in November, which she had previously told Grass constituted him condoning ongoing sexual harassment.

Although an employee's complaint of harassment or discrimination does not immunize the employee from being subsequently terminated for her workplace behavior, *Bernier v. Morningstar*, 495 F.3d 369, 376 (7th Cir. 2007), and there is no direct evidence that Grass intended to terminate Paris' employment prior to the December 20, 2007 meeting, the circumstantial evidence of record raises genuine issues of material fact for trial.  Because of the timing of Paris' complaints to Grass and the apparent inconsistencies between Grass's memorandum and his deposition testimony and the inferences that can be drawn therefrom as to the basis for terminating Paris' employment, there are genuine issues of material fact as to whether Grass in fact honestly believed that Paris had adopted her husband's derogatory statements and that her adoption of his statements was what caused Grass to consider her to no longer be a faithful employee or whether Grass based his decision

to terminate Paris' employment on her complaints of sexual harassment and discrimination. Therefore, both summary judgment motions are denied as to Count V of Paris' Second Amended Complaint for retaliation under Title VII.

## B. Breach of Contract

FCS argues that, under Indiana law, Paris was an at-will employee not under contract, that none of the exceptions to at-will employment apply, and, therefore, that she cannot maintain a breach of contract claim. FCS further contends that, even if the Salary Information Sheet were considered a contract, it was conditional, and Paris violated the condition. Finally, FCS argues that, even if Paris could not be terminated except for cause, there was good cause to terminate her. In contrast, Paris seeks summary judgment in her favor on the breach of contract claim, arguing that she indeed was under contract, that she could only be fired for cause, that FCS did not have cause to fire her, and, as a result, FCS breached the employment contract.

A contract is "an agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law." *West Am. Ins. Co. v. Cates*, 865 N.E.2d 1016, 1021 (Ind. Ct. App. 2007) (quoting Black's Law Dictionary 318 (7th Ed. 2001)). Indiana has long recognized two basic forms of employment: employment for a definite or ascertainable term and employment at will. *Orr v. Westminster Vill. N., Inc.*, 689 N.E.2d 712, 717 (Ind. 1997); *Trinity Baptist Church v. Howard*, 869 N.E.2d 1225, 1229 (Ind. Ct. App. 2007) (citing *Eck & Assocs., Inc. v. Alusuisse Flexible Packaging, Inc.*, 700 N.E.2d 1163, 1167 (Ind. Ct. App. 1998), *trans. denied*).

> If there is an employment contract for a definite term, *and the employer has not reserved the right to terminate the employment before the conclusion of the contract*, the employer generally may not terminate the employment relationship before the end of the specified term except for cause or by mutual agreement. If there is no definite or ascertainable term of employment, then the employment is at-will, and is presumptively terminable at any time, with or without cause, by either party.

32

*Orr*, 689 N.E.2d at 717 (emphasis added) (footnote and citation omitted); *see also Trinity*, 869 N.E.2d at 1229. "If the parties include a clear provision in the employment contract, the presumption that employment is at will may be negated." *Trinity*, 869 N.E.2d at 1229 (citing *Orr*, 689 N.E.2d at 717).

In this case, the "Faith Christian High School Staff Salary Information Sheet" provided Paris with a definite and ascertainable term of employment, subject to the condition that she remain "a faithful employee of Faith Christian." Pl. Resp., Exh. 1. The Salary Information Sheet was filled out by Leffew on behalf of Faith Christian School. The definite and ascertainable term of employment was for the 2007-2008 school year, specifically indicated in the right hand margin of the Salary Information Sheet as being from August 6, 2007, to May 24, 2008. There is a check mark on the form identifying Paris as a 10-month employee as opposed to 12-month employee. FCS argues that the start and end dates of August 6, 2007, and May 24, 2008, are inconsistent with "ten months" and that the thirty-six weeks in the notation "8.25/hr x 11 hrs x 36 wks =" constitutes eights months, not ten months. However, Indiana law requires that a school corporation conduct at least 180 student instructional days per academic year. *See* Ind. Code § 20-30-2-3. One hundred and eighty days equals thirty-six, five-day school weeks. Holidays and other reasons for school closings explain the difference between the 36-week notation and the start and end dates of the school year. Also, the complete months of August through May total 10 months. There is no inconsistency.

In addition to the definite term of employment, the Salary Information Sheet also includes the stated salary of $4,100 as well as $318 in social security benefits for that term of employment. There was sufficient mutuality of obligations–Paris to teach lower elementary music for 11 hours a week for 36 weeks from August 5, 2007, through May 24, 2008, as well as a K-3rd grade

33

Christmas program and a K-3rd grade spring program and Faith Christian School to pay her in semi-monthly increments a total cash salary plus benefits of $4,478. *See Terre Haute Reg'l Hosp., Inc. v. El-Issa*, 470 N.E.2d 1371, 1377 (Ind. Ct. App. 1984) (citing *Marksill Specialties, Inc. v. Barger*, 428 N.E.2d 65, 69 (Ind. Ct. App. 1981), *trans. denied*) ("Indiana law on this issue is well settled. There must exist mutual obligations under an agreement before it will be treated as a valid enforceable contract.").

The fact that the form is labeled "Faith Christian High School Staff Salary Information Sheet" is not controlling because the "words or labels of a contract are not conclusive but should be considered in connection with the provisions of the contract." *Trinity*, 869 N.E.2d at 1228 (citing *Rogers v. Lockard*, 767 N.E.2d 982, 991 (Ind. Ct. App. 2002)). Contract interpretation is not controlled by reference to labels; rather, the court must look through form to substance. *Id.* (citing *Merrillville Conservancy Dist. ex. rel. Bd.of Dirs. v. Atlas Excavating, Inc.*, 764 N.E.2d 718, 724 n. 3 (Ind. Ct. App. 2002)). In addition to the definite term written on the Salary Information Sheet itself, Lambeth testified that the Salary Information Sheet informed Paris that it was only in effect as long as she was a faithful employee of Faith Christian School: "There was a mutual *agreement* that as long as she remained a faithful employee of Faith Christian School then she would be employed under certain terms." Pl. Mot., Exh. 4, p. 25 (emphasis added). He testified that it was understood that she would be working for "what would be considered the school academic year." Def. Mot., Exh. D., p. 33-34. Leffew also testified that Paris' employment would continue as long as she was honoring the expectations of FCS and as long as they had enough students.

Having determined that Paris had an employment contract for a definite and ascertainable period, the Court considers whether FCS breached that contract when it terminated her employment

on December 20, 2007, and finds that it did not. On the face of the Salary Information Sheet, above Paris' signature is the typed provision: "I understand that this agreement is in effect only as long as I am a faithful employee of Faith Christian." Pl. Resp., Exh. 1. Accordingly, FCS included a reservation of the right to terminate Paris if she was not a "faithful employee" of FCS. *See Orr*, 689 N.E.2d at 717. Grass testified at his deposition that "during that meeting she became an unfaithful employee of our school." Def. Mot., Exh. C, p. 25. Although the Court has found in the context of her Title VII retaliation claim that there is a genuine issue of material fact as to the *basis* of Grass' belief that Paris became an unfaithful employee–either because she was not supportive of the discipline given by the administration to the students who had engaged in the alleged sexually harassing conduct or because Grass believed that Paris had adopted her husband's disparaging comments about Grass at the December 20, 2007 meeting–, for purposes of her breach of contract claim, Paris has not raised any genuine issue of material fact bringing into doubt Grass' honest belief that Paris had ceased to be a faithful employee of FCS.

Paris does assert in the context of this breach of contract claim that she was terminated in retaliation for her protected activity under Title VII. However, Count III of Paris' Second Amended Complaint is pleaded as a breach of contract claim, which is controlled by contract law, not a state law retaliatory discharge claim, which sounds in tort. *See, e.g.*, *McGarrity v. Berlin Metals, Inc.*, 774 N.E.2d 71, 77 (Ind. Ct. App. 2002) (citing *Remington Freight Lines, Inc. v. Larkey*, 644 N.E.2d 931, 940 (Ind. Ct. App. 1994)). The case cited by Paris, *Frampton v. Cent. Indiana Gas Co.*, 297 N.E.2d 425, 427-28 (1973), recognized an exception to the employment at will doctrine, which is not at issue in this case, on a claim of retaliatory discharge when the threat of discharge was impermissibly used as a "device" to avoid the employer's workers compensation obligations in

violation of the Indiana Worker's Compensation Act. Notably, the Court in this case has already dismissed any state law retaliatory discharge claims in its December 8, 2008 Opinion on Defendants' Motion to Dismiss. *See* 12/8/2008 Opinion (docket entry 58), p. 10 n.1.

Accordingly, the Court finds as a matter of law that there are no genuine issues of material fact and FCS did not breach the employment agreement with Paris. The Court grants FCS's Motion for Summary Judgment and denies Paris' Motion for Summary Judgment on Count III of the Second Amended Complaint for breach of contract.

## CONCLUSION

Based on the foregoing, the Court hereby (1) **DENIES** Defendants' Motion to Strike Plaintiff's Response in Opposition to Defendants' Motion to Strike [DE 86]; (2) **GRANTS in part** and **DENIES in part** the Motion to Strike Portions of Affidavits [DE 81]; (3) **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment [DE 67]; and (4) **DENIES** Plaintiff's Motion for Summary Judgment Against Faith Christian School [DE 72]. Plaintiff's claim of retaliation in violation of Title VII, alleged in Count V of the Second Amended Complaint remains pending.

SO ORDERED this 31st day of January, 2011.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:      All counsel of record